## In re HARRISON BROS.

### (District Court, M. D. Pennsylvania. October, 1912.)

1. BANKRUPTCY (§ 165*)—PREFERENCES—PAYMENT OF NOTES BEFORE MATURITY—PAYMENT THROUGH THIRD PERSON.

   A partnership while insolvent and within four months prior to bankruptcy sold its interest in one of its stores for $9,000, receiving $3,000 in cash and the balance in purchaser's notes. The proceeds were applied to take up before maturity certain notes held by a bank which had originally been given by the bankrupt firm to a claimant creditor which had been active in bringing about the sale, which was accomplished hastily, and at a time when claimant knew of the bankrupts' insolvency. Claimant secured the discounting of the notes given for the unpaid portion of the price by a bank of which one of the members of the claimant firm was vice president and a director. The claimant's notes had been transferred to the bank after the sale; claimant having procured a sufficient amount of the purchaser's notes to pay the notes at the bank, had the purchaser's notes discounted and handed the cashier's check received therefor to one of the bankrupts with direction where the notes were that he was to pay, and he used the check to pay the claimant's notes. *Held* sufficient to constitute a preference.

   [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 266; Dec. Dig. § 165.*]

2. BANKRUPTCY (§ 159*)—"PREFERENCES"—ESTABLISHMENT—EVIDENCE.

   Under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445) as amended by Act Cong. June 25, 1910, c. 412, § 11, 36

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Stat. 842 (U. S. Comp. St. Supp. 1911, p. 1506) relating to preferences, it is not necessary in order to establish a preference to prove the existence of the debtor's intent to prefer; the cause for belief on the creditor's part, that a preference was intended, and that the debtor knew of his insolvency; the test being whether the creditor receiving the alleged preference or to be benefited thereby, or his agent acting in the transaction at the time the payment was made, had reasonable cause to believe that the bankrupt was then insolvent, and that in accepting and retaining the payment the creditor would receive a larger percentage of his debt than any other creditor of the same class.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 246, 247, 262, 268–281; Dec. Dig. § 159.*

For other definitions, see Words and Phrases, vol. 6, pp. 5498, 5499; vol. 8, p. 7759.]

3. BANKRUPTCY (§ 163*)—"PREFERENCES"—PAYMENT TO THIRD PERSON.

A transfer by a bankrupt indirectly or through a third person may constitute a preference if it is made for the purpose and with the intent of securing to one creditor a larger percentage of his debt than would be paid to any other creditor of the same class.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248; Dec. Dig. § 163.*]

In Bankruptcy. In the matter of bankruptcy proceedings of Harrison Bros. Petition to review referee's order expunging the claim of Schloss Bros. & Co., on the ground that the claimants had received a preference which they had failed to surrender. Affirmed.

The following is the report of Arthur A. Smith, referee:

The said Samuel Harrison and Benjamin Harrison were upon the 8th day of December, 1911, duly adjudicated bankrupts as individuals and as a partnership; and thereupon said cause was referred to me for further proceedings thereunder.

On the 23d day of December, 1911, at the first meeting of creditors held in pursuance to notice, A. R. Jackson, of, Williamsport, and in said district, was duly elected trustee of said estate, and, upon December 26, 1911, duly qualified by filing his bond and having the same approved. At said meeting the claim of Schloss Bros. & Co., of Baltimore, Md., in the sum of $5,810.86, was filed and allowed. On the 26th day of February, 1912, the trustee filed his petition for a rule upon said Schloss Bros. & Co. to show cause why said proof of claim should not be expunged and disallowed; and on March 1, 1912, a rule was issued upon said claimant to show cause as aforesaid, returnable March 14, 1912, at 2 o'clock in the afternoon. On March 12. 1912, claimants filed their answer to said petition or motion to expunge, whereupon testimony was taken from time to time, and upon July 5. 1912, argument was had thereon. On the 9th day of August, 1912, after duly considering said matter, the referee made an order expunging said claim from the records, which said order is as follows:

"At Williamsport, in said district, on the 9th day of August, A. D. 1912. Upon the evidence submitted to the court upon the claim of Schloss Bros. & Co., against said estate, after hearing counsel thereon, it is ordered that said claim be disallowed and expunged from the list of claims filed of record in said case."

On the 12th day of August, 1912, claimants duly excepted to said order and petitioned the referee for a review thereof.

The testimony taken on said proceeding shows the following:

Facts.

That Samuel Harrison and Benjamin Harrison, trading as Harrison Bros., were upon the 8th day of December, 1911, upon a petition filed in this court

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

by themselves, adjudicated bankrupts, as individuals and as a partnership. That at the time the alleged preferential payment was made, to wit, on November 17, 1911, the said Samuel Harrison and Benjamin Harrison and Harrison Bros., were insolvent within the meaning of the Bankruptcy Act of 1898 and its supplements. That at the time the adjudication was made bankrupts were the owners of two stores, one located at Williamsport, in the Middle District of Pennsylvania, the other at Pitcairn, in the Western District of Pennsylvania, both of which were conducted under the name of Harrison Bros., and prior to the 15th day of November, 1911, they owned a two-thirds interest in the store of Harrison Bros. & Co., situate at Delta, Pa., which said firm was composed of Samuel Harrison, Benjamin Harrison, and O. C. Jones, each owning a one-third interest. On November 15, 1911, Harrison Bros. sold their interest in said store to Jones for $9,000, receiving in payment therefor $3,000 in cash and the balance in notes. These notes were indorsed by G. F. Bortner, Jones' father-in-law, and by his father. The Williamsport store was managed by Benjamin Harrison, the Pitcairn store by a relative of bankrupts, by the name of Frank, and the Delta store by Samuel Harrison. The sale of the interest of bankrupts in the Delta store was brought about in the following manner:

Creditors of bankrupts, among whom were claimants, had been insisting for some time upon payment of their accounts. On November 12, 1911, Jones received from Samuel Harrison, who was then in Williamsport, a telegram requesting a meeting in Baltimore that evening. Jones accordingly went to Baltimore, and waited at the Union Station for Samuel Harrison to arrive, where he met Harrison and B. F. Caston, credit man for Schloss Bros. & Co., and who states that he was returning to Baltimore from Rochester, N. Y. The three took lunch together at the Union Station, where Harrison opened negotiations with Jones for purchasing Harrison Bros.' interest in the Delta store. Jones stated that he was not in a position to buy, that he would have to arrange for the money, but Caston insisted that he purchase the interest, and that, if he did not, he (Caston) had a party who was prepared to take over the interest. It was agreed that Jones return to Delta and arrange for the notes. Caston took the names of the parties whom Jones suggested as indorsers, and agreed to assist in having the same discounted. They then separated agreeing to meet in York, Pa., on the evening of the 13th, at which time and place Samuel Harrison, B. F. Caston, O. C. Jones, H. C. Brenneman, Jones' attorney, G. F. Bortner, and H. J. Evans, Jones' brother-in-law, met in a room in the Colonial Hotel for the purpose of consummating the sale. At this meeting, as at all meetings, Caston took a very active interest, and stated that he was acting in the interest of Schloss Bros. & Co. The validity of this sale was questioned as being in violation of the act of General Assembly of Pennsylvania of March 28, 1905 (P. L. 62), and known as the "Bulk Sales Act." Caston took the position that, as it was a sale of the interest of members of the firm to another member of the firm, it was not necessary to give notice as required by said act. Pending the decision of this question, the parties separated, and agreed to meet at Mr. Brenneman's office the following morning. The financial condition of Harrison Bros. was discussed at one of the meetings, and Caston stated that he had gone over their affairs; that he had dealt with them for years and knew their standing; that he regarded them as solvent; that Schloss Bros. & Co. were heavy creditors, and that he was assisting in making the sale in their interest; that the bankrupts were being hard pressed for immediate settlement; and that, as he viewed the situation, there was no danger of Harrison Bros.' failure.

On the following morning, the 14th, a meeting was held in Mr. Brenneman's office, when terms of sale were agreed upon; Jones agreeing to pay $9,000 for the interests of bankrupts in the store, paying $3,000 in cash and the balance in notes. Pending the securing of a power of attorney from Benjamin Harrison, the parties agreed to meet again on the 15th and close the deal, which was done and the sale consummated. The notes used in payment of the consideration were furnished by Caston, and, when they were executed and indorsed, he took $4,500 of the notes with him to Baltimore, and delivered them to Michael Schloss, who arranged for their discount at the Western National

Bank of Baltimore, receiving a draft or cashier's check for the proceeds, which was delivered to Samuel Harrison in the office of Schloss Bros. & Co., on the 17th day of November, 1911, on which day, at the direction of Michael Schloss, Samuel Harrison used it together with sufficient cash to take up three notes aggregating $4,664.56 at the National City Bank of Baltimore, of which bank Michael Schloss was a vice president and a director. These three notes, when paid, were destroyed by Samuel Harrison. The evidence, however, supplies sufficient facts to show their amount, date when given and when due, and the manner of their execution, viz,: One note dated July 25, 1911, for $3,500, due November 25, 1911; two. notes dated August 21, 1911, and payable December 1, 1911, one for $773.50, the other for $391.06. The notes were signed "Harrison Bros.," made payable to the order of "Ourselves," and indorsed "Harrison Bros.," being negotiable and payable without offset at the National City Bank of Baltimore, Md. No other indorsements appeared thereon.

The payment of these three notes are a material fact in this proceeding, and a careful review of the testimony relating to their origin, ownership, and payment is necessary.

Before the motion to expunge was filed in this case, Michael Schloss on January 9, 1912, was examined with reference to the ownership of these notes. At this examination, before Referee Willis E. Myers of Baltimore, he testified that originally the three notes belonged to him individually; that they were given for a loan which was originally for $8,000, made about a year before; that later on he turned the loan over to the firm of Schloss Bros. & Co., receiving the funds therefor, and later on it was turned over to him, and, when they were delivered to the bank on November 13, 1911, he was the owner thereof; that there was no written evidence of the transaction except the notes themselves; that Schloss Bros. & Co. could not have rendered a complete statement of Harrison Bros.' indebtedness to them without his assistance because his private records were in very bad shape, and that the only record of his individual notes was one kept by himself in marked envelopes, and the firm's cashier slips.

After the motion to expunge this claim was filed, he was again examined before Referee Myers, on March 29, 1912, and he then stated, with the books of Schloss Bros. & Co. before him, that the two notes for $773.50 and $391.06 dated August 21, 1911, were the notes of Schloss Bros. & Co., and had never been his property; that the $3,500 note was a balance due on a $5,000 note given to Schloss Bros. & Co., October 28, 1909, and which had remained their property until May 11, 1911, when, one of his firm having objected to carrying it any longer, the note was charged to his private account on the books of the firm. The note was again renewed on July 25, 1911, for four months, at which time Harrison Bros. were informed that it would have to be paid at maturity. The bills receivable book of Schloss Bros. & Co., in which this note was entered on May 9, 1911, shows in red ink, the following: "This note was renewed for four months from 7-25-11 and taken personally by M. S. 5-11-11." The ledger of Schloss Bros. & Co., in their account with Harrison Bros. on the margin of page 172, has the following words and figures in red ink, to wit: "M. S. Pers. No. 9765, 7-25-11, $3500.00." This number corresponding with the number of the note entered in bills receivable book on May 9, 1911. The meaning of the above indorsement, as testified to by Michael Schloss, is that on May 11, 1911, the $3,500 note was taken personally by himself, and that on July 25, 1911, it was renewed for four months, the note still remaining his property. On May 11, 1911, there appears to have been an entry made of the $3,500 note in a ledger containing the account of Michael Schloss with the firm of Schloss Bros. & Co., in which Michael Schloss is charged with this note. By whom or when made there is no evidence except the book itself. Michael Schloss stated in his first examination that there was no record of this transaction except the note itself, which he kept among his private papers, and the firm's cashier's slips. At the second examination. after the motion to expunge had been filed, this record turns up together with other records or notations in red ink, one of which reads, as stated above: "This note was renewed for four months from 7-25-11." The very wording of which would indicate that

the entry was made after 7–25–11. All the other evidence, except the entry made May 11, 1911, in the private account, indicates that the note was the property of Schloss Bros. & Co.. The loan originated with them, and, as will hereafter appear, they received payment thereof.

On November 13, 1911, six notes, among which were these three, were placed by Schloss Bros. & Co. in the National City Bank of Baltimore, for which they received credit in their account. The notes had never before been discounted, and the reason for placing them in bank on the very day Michael Schloss learned of the sale of the Delta store is explained by him, in his first examination, as follows: That being in need of funds for use in some private affair he "sold" the notes to the bank at that time for the purpose of raising cash; but there is no evidence that the proceeds of any of these notes was ever turned over to him at that time or any subsequent time. The evidence clearly shows that Schloss Bros. & Co. received the proceeds of the notes, were credited with the same at the bank, and never turned any part over to Michael Schloss. At the time the notes were placed in bank Michael Schloss sustained a very peculiar relationship with Schloss Bros. & Co. and the National City Bank, being a member of the firm of Schloss Bros. & Co. and a vice president and director of the National City Bank.

There is consequently a very wide discrepancy in the testimony of Michael Schloss given at the two examinations. At the first hearing he claimed title to all three notes; while at the last he claimed ownership of only the $3,500 note. The only evidence, as previously stated, corroborating his testimony as to his ownership of the $3,500 note is the entry in the private ledger under date of May 11, 1911; but the entries in red ink appear to us to have been manufactured to meet the conditions of this case, having been inserted therein after all the other entries had been made. We cannot reconcile the testimony given by Michael Schloss at the two examinations, other than that the same was manufactured for the purpose of meeting the facts in this proceeding. We are of the opinion, and so find, that all three notes at the time they were placed in the bank were the property of Schloss Bros. & Co., in whose possession they remained until the 13th day of November, 1911, when, after learning of the proposed sale of the Delta store, they were placed in the bank, knowing that part of the proceeds from the sale was to be applied to their payment. These notes were not only deposited for the first time in bank on the 13th of November, 1911, paid November 17th, but all three were paid before maturity; the $3,500 note not being due until the 25th of November, 1911, and the other two notes not until December 1, 1911.

In addition to the haste and unusual method employed by Caston and Samuel Harrison in raising cash with which to pay the three notes, the following facts concerning the financial condition of bankrupts were known to claimant, or could have been easily ascertained by reasonable inquiry: That they held five overdue notes aggregating $1,850 which bankrupts could not pay when they fell due, and also owed a balance of $100 on the sixth note, past due. The only payment which they had received from bankrupts since February 14, 1911, except payments on notes, was a payment on October 13, 1911, of $150. The Williamsport store had never been a paying proposition, and the strike had affected the sales at Pitcairn. Bankrupts had settled their 1910 account by giving notes, many of which had not been paid when due. That the two smaller notes paid at the bank on the 17th of November were given to close up small balances then due. During the summer and fall of 1911 Benjamin Harrison wrote a number of letters asking extension of time on notes coming due, during which time claimants wrote letters insisting upon payment. Bankrupts owed notes at banks at Delta, Pitcairn, and Williamsport, which were demanding payment, and, in order to meet these payments and the notes claimants held, the sale of the Delta store was necessary.. That in March, 1911, Dun & Co. gave bankrupts a rating of but $20,000 and good credit. That Caston, before the sale was made, stated that he had investigated the affairs of bankrupts and believed that they were solvent; but, had his investigation been thorough, he would have discovered that bankrupts had taken on 25 new customers for fall shipments at the Pitcairn store, none

of whom had been paid, that they owed about 175 creditors an amount in excess of $75,000, and that the only assets to take care of these remaining creditors were the goods in the stores at Pitcairn and Williamsport, which would not have been sufficient to pay their other creditors.

This being a proceeding brought by the trustee to expunge the claim of Schloss Bros. & Co. amounting to $5,810.86 filed and allowed, the following conditions, or elements of a preference, must appear from the foregoing facts:

First. That the bankrupts at the time the payment was made were insolvent, both as a partnership and as individuals.

Second. That the alleged payment was made within four months of the filing of the petition, viz., four months prior to December 8, 1911.

Third. That the bankrupts made a transfer of their property—a payment of money—to Schloss Bros. & Co., or, if not to them directly, that they were the persons benefited thereby.

Fourth. That such payment enabled Schloss Bros. & Co. to receive a greater percentage of their debt than other creditors of the bankrupts of the same class, and

Fifth. That Schloss Bros. & Co., or their agent acting therein, had reasonable cause to believe that the enforcement of the payment would effect a preference.

## Conclusions of Law.

1. That at the time the alleged payment was made the bankrupts were insolvent both as individuals and as a partnership.

2. That the payment was made within four months of the filing of the petition.

3. To arrive at a proper legal conclusion with respect to this element of a preferential transfer, or payment, a review of the testimony becomes necessary.

[1] That the bankrupts made a transfer of some of their property—a payment in money—thus depleting the assets of their estate, there can be no question; but the trustee bases his right to recover upon the ground that the payment to the National City Bank was a mere subterfuge, a trick, a previously conceived and fixed plan or scheme to escape the penalty of the act, in that they purposed to do by indirection that which they could not have done directly without having the transaction decided against them in case the question ever arose, and that the note of $3,500 had to be paid on the 25th of November, 1911, when it became due, was clearly understood between Schloss Bros. & Co. and the bankrupts, and that, instead of making payment direct, it was made to the bank in order to avoid any legal question, should the same arise.

Schloss Bros. & Co. had knowledge of the fact that during the year bankrupts were hard pressed for cash, and to pay these notes or any large obligation it would mean extra exertions on their part. These notes could not have been paid if bankrupts had not sold their interests in the Delta store, which fact was known to claimants. Caston repeatedly declared when the sale was being negotiated, that he was acting for Schloss Bros. & Co., who were heavy creditors, and that they were demanding payment. At no time is it stated that the sale was being in the interest of Michael Schloss. It is a strange coincidence that the three notes should be sent to the bank on the very day that Michael Schloss learns of the sale of the Delta store. True, he states that they belonged to him, and, being in need of money for use in some private business, he sent the notes to the bank to raise some necessary cash: but the significant fact is that the notes were sent to the bank by Schloss Bros. & Co., and they, not Michael Schloss, received credit therefor, and nowhere does the testimony disclose the fact that Michael Schloss ever received the proceeds of the three notes. The notes passed by delivery, and, Schloss Bros. & Co. having received the cash therefor, the only natural presumption to draw from all the facts is that, when the notes were placed in the bank, Schloss Bros. & Co. were the owners.

The evidence shows that Michael Schloss is a member of the firm of Schloss Bros. & Co. and a vice president and director of the National City Bank. His conduct, therefore, in a transaction of this nature, ought to be above

suspicion; for when a member of a firm deals as an individual with his firm and such dealings will affect their creditors, or when, by such dealings with their own debtor, the rights of other creditors of their debtor are affected, or when the relation of the creditor and his banker are so close that the creditor has a voice and influence in both his firm and his bank, and by means of that relationship he obtains a greater advantage from his debtor than any or all the other creditors of his debtor, the transaction, though not fraudulent per se, must be scrutinized, and the rule that the burden of proving every element of a preferential transfer are upon the trustee must be relaxed.

Had these notes been placed in bank at the time they were delivered to Schloss Bros. & Co., or at any renewal thereof, and not at a time when the holder thereof knew that they were to be paid within a few days, a very different condition of facts would be presented. The whole transaction from beginning to end is very unusual, and cannot possibly be called or labeled "a transaction in the usual course of business." From beginning to end the hands of claimants are seen guiding every move, and that influence is not removed until the notes are finally paid.

It is argued that Schloss Bros. & Co. received no benefit from the payment, and, therefore, the claim must stand. Mr. Sipple of the National City Bank, who had charge of the discounts, testified that the notes were sent to the bank by Schloss Bros. & Co., and that they received credit therefor; that they were taken by the bank upon the recommendation of Michael Schloss, who, while not legally bound to take care of them if they were not paid, yet he was morally bound and that they would have looked to Schloss Bros. & Co. to make good if the notes had not been paid. Yet when three notes, which have never before been placed in bank, are placed there as these notes were and paid before they were due, there evidently was a reason for it. Schloss Bros. & Co. knew that they were to receive payment of these three notes out of the assets realized from the sale of the Delta store and placed the notes in the bank so that payment would be made to the bank instead of to them, and thus relieve themselves from an action of this very nature, which they no doubt saw coming, for they had reasonable cause to believe, at the time they placed the notes in bank, that the bankrupts were insolvent, and that a payment to them would effect a preference. No other conclusions can be drawn from the evidence. They were the active parties in the sale of the store. They secured the discounting of the notes given in payment therefor. They were careful to get in their possession sufficient of the notes to take care of their claim at the bank, having the notes discounted and handing the draft or cashier's check received therefor to Samuel Harrison with direction where the notes were that he was to pay.

Another significant fact is that at the time the payment was made to the bank bankrupts owed claimants an additional claim of $5,810.86. Claimant no doubt had the right, in the absence of direction from his debtor, to apply the payment on any one of a number of claims; but when that application, as resulted in this case, injures other creditors, and it appears that the payment was applied in such a way that it has resulted in injury to other creditors, it bears scrutiny. Again, if this transaction bears no badge of fraud, as claimants would have us believe, why was the payment made to the bank, instead of being applied on the other indebtedness. To our mind the answer is obvious. Claimants saw the inevitable consequence of such application, for the account was due and the notes were not.

The facts herein disclosed a transaction peculiar to the Bankruptcy Act. We have been unable to find a case where the facts are identical. Loveland, (3d Ed.) § 194a, pp. 556, 557, states that a "creditor will not be permitted to obtain a preference indirectly by transfer of his account—or other colorable device or transaction intended to evade the provisions of the Bankruptcy Act." Collier (7th Ed.) p. 66, says: "A transfer may be made to a third person and still be a preference, for a creditor may be benefited thereby. Hence the phrase 'the person receiving it or to be benefited thereby,' words found in the same connection in the law of 1867. It is immaterial to whom the transfer is made, if it be for the purpose of paying the claims of one creditor in preference to those of others."

4. That the payment of the three notes enabled claimants to receive a

larger percentage of their debt than other creditors of the same class is clear from the evidence. They received a payment of $4,664.56 on a total indebtedness of $10,475.42 or a percentage of more than 44 per cent.; while this estate as agreed upon by counsel cannot under any circumstances pay over 40 per cent.

[2, 3] 5. The remaining element entering into the preferential transfer, or payment, viz., Did Schloss Bros. & Co. or their agent acting therein have reasonable cause to believe that the enforcement of the payment would effect a preference? requires an interpretation of the law as it stands to-day on that point, for the amendment of June 25, 1910, changes the law materially. The amendment reads as follows: "Sec. 60b. If a bankrupt shall have procured or suffered a judgment to be entered against him in favor of any person or have made a transfer of any of his property, and if, at the time of the transfer, or of the entry of the judgment, or of the record or registering of the transfer if by law recording and registering thereof is required, and being within four months of the filing of the petition in bankruptcy or after the filing thereof and before the adjudication, the bankrupt be insolvent and the judgment or transfer then operate as a preference, and the person receiving it or to be benefited thereby, or his agent acting therein, shall then have reasonable cause to believe that the enforcement of such judgment or transfer would effect a preference, it shall be voidable by the trustee and he may recover the property or its value from such persons." This amendment obviates the necessity of proving (1) the existence of the debtor's intent to prefer; (2) the cause for belief on the part of the creditor that a preference was intended; and (3) that the debtor knew his insolvency. The test now is whether the person receiving the payment, or to be benefited thereby, or his agent acting therein, at the time the payment was made, had reasonable cause to believe that the bankrupt was then insolvent and that in accepting and retaining said payment, he would receive a larger percentage of his debt than any other creditor of the same class.

At the time the payment was made claimants knew that, in order to raise funds to pay the notes which they had placed in bank, it was necessary for bankrupts to dispose of a $12,000 asset for $9,000, namely, the Delta store; and this in violation of the Bulk Sales Act of Pennsylvania. All the circumstances surrounding this sale, the haste with which the deal was closed, the interest of claimant's agent therein, the taking of $4,500 worth of notes to Baltimore, securing their discount, turning the proceeds therefor over to one of the bankrupts with directions where payment of the notes should be made, are all so unusual that the reason that would actuate it must have sprung from a well founded belief that the bankrupts were insolvent. In addition, a number of notes past due were not paid at maturity, the bankrupts having repeatedly asked extension of time thereon, for the payment of which they were continually dunned by claimants. The Williamsport store was never a paying proposition and business at Pitcairn was sorely affected by reason of the strike. Payment of 1910 shipments were paid in notes; the banks at Delta, Pitcairn, and Williamsport were carrying large loans, and were demanding payment; the only cash payment made by bankrupts, except the payment of notes, for eight months was a small payment of $150, facts which were known to claimants, and, when all taken together, are of such a nature as to cause a reasonably prudent business man to believe that at the time the payment was made bankrupts were insolvent, and that a preference would be effected thereby. Grant v. Bank, 97 U. S. 80, 24 L. Ed. 971; Bank v. Cook, 95 U. S. 343, 24 L. Ed. 412; Toof v. Martin, 13 Wall. 40, 20 L. Ed. 481; Wager v. Hall, 16 Wall. 584, 21 L. Ed. 504, and In re Eggert (C. C. A., 7th Cir.), 4 Am. Bankr. Rep. 449, 102 Fed. 735, 43 C. C. A. 1. And with these facts claimants are chargeable with knowledge.

Further, the circumstances surrounding the whole transaction were of such a nature as to put claimants upon inquiry—not alone from the bankrupts as was done—but from such sources where the information obtained could be relied upon; and, having failed to inquire, they are constructively chargeable with the knowledge that such inquiry would have revealed. Coder v. McPherson (C. C. A. 8th Cir.) 18 Am. Bankr. Rep. 523, 152 Fed. 951, 82 C. C. A. 99; Brewster v. Goff Lumber Co. (D. C., Pa.) 21 Am. Bankr. Rep. 106, 164

Fed. 124; McElvain v. Hardesty (C. C. A., 8th Cir.) 22 Am. Bankr. Rep. 320, 169 Fed. 31, 94 C. C. A. 399. And such inquiry would have revealed such a condition of affairs that no reasonably prudent business man could have acted thereon without knowing what the inevitable result would be. Our view of the case is best expressed by Judge Holcomb in Re Hackney v. Hargreaves Bros., 13 Am. Bankr. Rep. 164, 68 Neb. 624, 99 N. W. 675, wherein the court says: "If the provisions of the bankruptcy law may, by an arrangement so transparent as those under consideration, be evaded, then, indeed, has the law failed of its purpose as if it were a sieve designed to hold water. * * * A court will not hesitate to throw off the covering and ascertain the true nature of the transaction under inquiry. If the transactions are in truth and substance plans whereby creditors secure a preference, and which result in violation of the provisions of the Bankruptcy Act, a court ought not to hesitate to so characterize them. The act was designed to bring about equality between creditors of a bankrupt, and to prevent one creditor by any method. either direct or indirect, from securing an unlawful preference to the exclusion of others."

M. C. Rhone, of Williamsport, Pa. (A. R. Jackson, of Williamsport, Pa., on the brief), for trustee.

Sprout & Cupp, of Williamsport, Pa., for claimant.

WITMER, District Judge. After hearing the argument of counsel, and on examination of the opinion of the referee, and the testimony submitted, the findings, conclusions, and order of the referee are affirmed. The well-considered opinion of the learned referee is adopted as the opinion of the court.